Thank you, Your Honor. May it please the Court, I represent the trustees, the plaintiff below, and the appellants here. There are three parties to the underlying transaction here. We have an employer, we have a union, and we have a trust fund. There are three separate parties, but there's only two parties to the litigation, which is the trust fund, my client, and the employer. Now, the union, which is not a party to this case, and the employer, which is, have different tales to tell as to what went on in terms of some oral discussions. And our position here is those discussions are largely irrelevant for our purposes here today, because we're here to discuss the case between the trustees and the employer, not the union case. Am I foolish to assume that if the trustees prevail in this case, the union would take the position that the employer is a stop to argue in a 301 suit that the Tomka employees are not covered by the collective bargaining agreement? The union might take that position, or it might be constrained to bring the case in the National Labor Relations Board. They may not be 301 jurisdiction at all. And what about the pension fund, which the auditor says is owed $65,000? It is true that the pension fund could do a Me Too lawsuit. That's absolutely true. I thought there was, I thought ERISA made the pension claim a little tougher. Not really. Whether it's a pension plan or a health and welfare plan, they're still in the same position. The question is, what is the plain meaning of the collective bargaining agreement? It's actually very different. I haven't checked this one out, but there's something somewhere in the briefs that the pension fund would have an uphill battle. Therefore, I infer it's no surprise that we have the health and welfare fund here. Well, I'm here representing the health and welfare fund. We're here largely because we have a very large claim, and we're suing under 515 of ERISA, which gives us a fairly straightforward claim. To organize the court's analysis of the case, let me offer three essential points. First, the trustees enforce the plain meaning of the collective bargaining agreement. Defenses outside the face of the contract don't apply. Given that point, the first order of business for the court is to determine, is this collective bargaining agreement plain? If it is, which is my second point, then the trustees win the case. Third point I'd like to make, sort of a decision tree here, if the agreement is ambiguous, well, then we've got to get into some of this he said, she said between the union and the employer, and there may well have to be a trial. Although, there's some question about that, given the lack of evidence put in by the employer to support its case. But that's the decision tree. Step one is, do we have a plain collective bargaining agreement? Because the trustees can rely on that plain collective bargaining agreement to enforce its right to benefit contributions. We submit that the collective bargaining agreement is plain, and that's all we're enforcing here. The collective bargaining agreement, article 20, we have a health insurance provision, standard. Employers shall provide group health insurance for each eligible regular employee. Eligibility is discussed in that chapter. There's some probationary periods and the like. Premium of $618 per month. It's only plain when you lop off the half of the critical provision. Okay, well, let's get to that, your honor. Because we've got to define who an employee is. And so we look at article one of the collective bargaining agreement. And that says, all employees of employer under this agreement. And it goes on, lest there be any misunderstanding of such a broad clause. To define that term functionally. And the agreement goes on to say, namely, this is very helpful to a construing court. Namely, machine hands, cabinet makers, gluers, other production employees, including some are in part-time help. If they perform the function, and there's no question that the employees of the Minnetonka plant perform these functions. And if they're employees of the employer, then they're employees covered by this obligation to contribute health insurance premiums. A couple of places in your brief you used, I believe, labor classification number. One of the briefs. Now, whose labor classification number is that? And where does that come from? Is that a union number? Is that a number that the employer applies to its workers? Is this a federal number that comes from some classification catalog? Define that for me. Well, I'm drawing a bit of a blank on that reference, Your Honor. I will say that there is no dispute that these employees perform the functions. Whether they're at Minnetonka or they're at the plant in Main Street, Hutchinson, they perform the same functions. Well, you argue that they're the same labor classification number. I'm just wondering whose number is that? They're on the same payroll. What was- It's the employer's- Employee ID number. On the employer's payroll. Right, because in the he said, she said battle between the union and the employer here, the union's narrative is that, well, there was a deal where they were going to form a separate company, a separate entity. It would have its own payroll number, and it would be separate. This would be a double-breasted operation. You have sort of a non-union company. It's wholly owned, but it's separate and it's non-union, and then you'd have a union company. As it turns out, all the employees were paid under the same employee ID number, same payroll. On the payroll, if they had put behind the Hutchinson people that number with an H-H and Minnetonka-M, it wouldn't be the same labor classification number, so your argument would slide downhill a little bit on that basis. Well, it brings to bear the point that it wouldn't have taken a lot for Goebel to have escaped any injury here. All they had to do, and we do this as lawyers, form a separate company with a separate payroll and a separate employee ID number, and pay them separately, and run the company separately enough so that you cannot pierce the corporate veil. It doesn't take a lot. It's a pain. It doesn't take a lot of work. Goebel simply didn't do that. They paid everybody under the same. They operated the same company. They were all employees of Goebel, same payroll identification number. They simply did not do that. This is now kind of found money because your trust didn't pay for the medical coverage and so forth of these employees. It was done separately, and so you get money for which you don't have to lay anything out. Not necessarily. We have an obligation to cover folks. It could be folks will come out of the woodwork and say, well, under the employer's plan, we didn't get reimbursed for this. We want to be reimbursed for this. We'll take each claim as it comes up. There is an interesting case that I do want to draw the court's attention to because I don't believe it's cited in the briefs. It's a Ninth Circuit case. This is the Lowe's Market case, 58F3, 1441. And in that case, we had the same thing where the employer put in its own plan while they were fighting over this. And one of the defenses of the employer was, geez, this is not fair. We covered these guys. This is a windfall. And the Ninth Circuit said, no, the policies were dealing with a statute. The congressional policy decision is clear. And the fact that you formed your own employer plan is irrelevant. We're not dealing with a statute here. We're dealing with a contract. Well, that's true. We are dealing with a contract. But we're also dealing with a statute that allows us to, as trustees, to enforce the plain meaning of that contract, and not to be bound by a number of the defenses that could validly be asserted against the union. So we're dealing with both. And I believe the critical question here, as you pointed out before, Your Honor, is, is this a plain agreement? Because if it's a plain agreement, it's an easy case. If it's not a plain agreement, then we have to get into this he said, she said between the union and everyone else. One of the things that bothers me in the briefs is this talk about subject matter jurisdiction. Why is this an issue of primary jurisdiction? That's different than subject matter jurisdiction. It seems to me everything is wrong here in the pitching of these briefs. There is this distinction between primary and subject matter jurisdiction. In primary jurisdiction, you don't have to dismiss. That's true. The district court elected to dismiss. There's no challenge to the remedy, but that's not. The idea of primary jurisdiction would be we'll stay this matter and we'll let the experts, the agency. Let the union take the lead. Let the agency decide it. But that. You point out quite properly that the trustees can't go to the agency. We cannot go to the agency. But the effect of a nuanced primary jurisdiction ruling would be the union has failed to assert what the trustees claim are the union's rights under the agreement, which is within the primary jurisdiction of the NLRB. Therefore, I'm going to stay this and let the union until a union either does or does not press the issue. If it does not, I will dismiss. And what's wrong with that approach? In the meantime, they've got to pay the benefits. And in fact, the Lowe's decision. Wait, wait, wait. No. That's exactly. Not if the labor board says no. Well, again, I'd refer you to the Lowe's case, the Ninth Circuit case. I don't care about the Lowe's case. Well. I mean, I'll read it, but you've just said, oh, it's all statute. Well, I don't. You know, 515 is all well and good, but primary jurisdiction is one of our tools for sorting out these kinds of interstatutory conflicts. But we have the ERISA statutes talk about the exclusive jurisdiction for the trustees case being in the district court. And the Eighth Circuit has used that since 1981 to take the position that, look, the union and employer can have their intramural squabbles. But the trustees can come at the court and enforce the plain meaning of the collective bargaining agreement. And. It's not a plain meaning. Well. I mean, it's absolutely not a plain meaning. Otherwise, the union would never have tolerated the employer's position. Well. I, factually, I think there's a good reason why the union tolerated the employee's position, which is trustees said he thought this was a double-breasted operation. But the plain meaning of the contract is all employees of the employer, functionally defined. Doesn't matter where they're located. Let me ask you this. There's no dispute that the union never represented the Minnetonka employees, right? They never had a chance. And again. But they never represented them. They never did. And in the trust document, it defines employee as an employee represented by the union. That's true. So why isn't a plain language reading here that you're owed nothing? But the reason they were not represented by the union was because they breached their plain obligation under the agreement to sign them up for the health insurance and ultimately to have them be members of the union. Exclusive jurisdiction of this court. Whether the employer breached the collective bargaining agreement in dealing with the union is not within ERISA's exclusive judicial jurisdiction. It's just not. The agreement says all employees of the employer, functionally defined. They've got to pay the benefits. And if they want to spend years litigating this to the NLRB or some other forum, they can do so. But in the meantime, the benefits have to be paid. That is the tenor of 30 years of decisions from this court that join the decisions of the Third Circuit and the Seventh Circuit and the Ninth Circuit. Enforcing the plain meaning of this agreement that they have to be covered. And we're insulated from that. And we should be.  If the court were to adopt a primary jurisdiction approach, a couple of years of squabbling. That's what Congress had in mind to prevent when they passed the statute in 1981. We should be able to cover these people now and get the premiums paid now. And they can fight all they want. But in the meantime, we cover and we get the premiums. I note that I've blown through some of my time. I'll reserve the rest for rebuttal. Thank you. Mr. Lipschultz. Counsel, and may it please the court, good morning. I'm Noah Lipschultz. I represent Global Fixtures, the epitome in this matter. The issue in this case boils down to whether the bargaining unit includes Hutchinson and Minnetonka. And that's an issue exclusively within the province of the NLRB under Section 9B of the National Labor Relations Act. Where is the word bargaining unit in the relevant contract documents? The word bargaining unit, Your Honor? You just said that this is an issue that turns on the bargaining unit. That's not in the trust agreement, is it? No, it's not. I doubt those words are used in the trust agreement. No. Well, it says covered by a collective bargaining agreement when it defines employees as represented by a union. Contributions are owed under the trust agreement if mandated by the collective bargaining agreement, which doubles back to the question of do you interpret the recognition clause of the collective bargaining agreement at Hutchinson to apply to the employees at Minnetonka as a single bargaining unit, one contract covering both facilities. And the NLRB has set up a whole series of presumptions and tests that it applies when there's a newly established facility and an existing collective bargaining agreement and a dispute about whether or not the agreement applies to the new set of employees. Does the NLRB have jurisdiction, though, to hear an ERISA claim? Pardon? Does the NLRB have jurisdiction to hear an ERISA claim? No, it does not, Your Honor. Isn't this an ERISA claim? It's couched as an ERISA claim, but there's a threshold issue. I don't think you can use ERISA. I think it's improper what the trustees are trying to do here to use ERISA to impose a collective bargaining agreement on an entire facility of employees that are not represented by a union. So doesn't your position leave them with no remedy? They shouldn't have a remedy, Your Honor, because there's no underlying collective bargaining agreement that would require contributions. That may not matter in some cases, depending on how your trust agreement reads, depending on whether there are extrinsic agreements that make the existence of a collective bargaining agreement and union representation irrelevant to the question of contributions. Your argument is that they've got to go to the NLRB. Pardon? I think your argument is they have to go to the NLRB, right? Well, the trustees are not allowed to go to the NLRB, but the union was required to go to the NLRB, and it considered doing so. I think that's very revealing testimony by Trustee Kern when he considered going to the NLRB to get an accretion determination with respect to the relationship of the two facilities. I think that's very revealing. He chose not to, and that choice has a consequence in this case. It means that you have a non-union facility, and you have a union facility that is covered by the collective bargaining agreement. The proper course, if the choice is, if the desire is, to impose this agreement on an entire group of employees at a stand-alone facility, the choice is you go to the NLRB and you get an accretion determination. You file what's called a unit clarification petition saying it should be two facilities under this agreement, not one. You have an election conducted by the NLRB by the employees so they can exercise their rights under Section 7 to elect union representation. Those are the proper avenues. You cannot have a backdoor under the guise of ERISA. It's no different than the Section 301 cases we cited to the court where the union under the guise of contract interpretation tries to seek backdoor representation and get in front of a federal court issues as to the propriety of the bargaining unit. ERISA doesn't allow that any more than the LMRA Section 301A does, and that's what's going on here. And as far as this issue about whether or not it's a he said, she said, it's absolutely not a he said, she said. The entirety of the record regarding the discussions is on page 71 of Trustee Kern's deposition transcript. Trustee Kern was never told there would be a double-breasted operation. He was never told it would be a separate company operating Minnetonka. Why he assumed these things and why he's bringing that up after the fact is anybody's guess, but I think the district court dealt with this in footnote three of its opinion where Judge Erickson concluded there was no basis in the record for Kern to have assumed it was a separate company. In fact, there was ample basis in the record that showed Kern's knowledge that there was a separate facility and he was told it would not be part of the bargaining unit and he was told Minnetonka would be a stand-alone entity. It then became incumbent upon him if he felt as a union business agent that was improper and the contract should apply, he had remedies at the NLRB. If as a trustee he felt that was improper and the contract should apply, then the trustees had a fiduciary obligation to go to the Minnetonka employees and say, guess what? You're covered by our health plan. Here's information about our health plan. Here's how to file a claim. They never did any of that. There is nobody except the trustees in this case, in this lawsuit, that believed and understood that this agreement applied to Minnetonka. The pension fund didn't believe it. The union didn't believe it. The company didn't believe it. So there's... Even the CBA is language limiting the bargaining unit to the Hutchinson employees. I believe when you read the preamble and it defines it as being limited to 528 Dale Street in Hutchinson, defines the employer that way, defines everything after the agreement, and that's the way the parties have administered it for 50 years, I think it's clearly limited to Hutchinson. If you find any ambiguity in that, all of the extrinsic evidence points in one direction, and that's in favor of the company's interpretation of the CBA. And that's why trustee counsel below, when asked by Judge Erickson what we would be trying, if she found a genuine issue of material fact, he said, I'm not really sure what we would try, because there's nothing to try. So what case or statute says that the union has to go to the NLRB first before the trustees can assert an ERISA claim in federal court? Your Honor, frankly, there's no case that specifically says that, because neither side could find a case that posed this conflict in such a square way as it's posed in this case. In other words, the closest that you have, Your Honor, are Section 301A cases. You have Booson Quarries by this court. You have Iowa Power and Electric by this court and Ketchikan Pulp in the Ninth Circuit that all dealt with the question of, if we frame it as a breach of contract, that means it's not an NLRB issue. And the courts rejected that argument and held that, no, it's for the NLRB to determine when a definition of the bargaining unit is essential to liability. None of those cases, though, are ERISA claims, right? That's right. That's right, Your Honor. But I don't think that the policy considerations that drove those results are any different in the ERISA context. I don't think they're any different. They all rest on the premise that under Section 9B of the Act, to protect Section 7 rights, the NLRB is the exclusive venue for determining whether or not a bargaining unit consists of a single or multi. Does the Seventh Circuit, Martin v. Gorman Construction, is that contrary to your position or not? I don't think it is. I believe in that case it was a Section 8F agreement that was unilaterally repudiated. It was along the lines of the Section 8F cases that we discussed in our brief, where what happens is an employer and union validly enter into a Section 8F construction industry contract without a majority support of the union because it's not required by statute, and then later the employer tries to back out and defend against a trustee action saying, guess what, the union never represented a majority of these employees, and even though the agreement was clearly valid when entered into, we're now going to unilaterally cease contributions. So I don't think that's our kind of case here. I don't think those facts are present here. It's completely different. What I do know is that what the NLRB and the federal district courts have held in every case that I could find that involved a question of a newly established facility of a discrete group of employees with Section 7 rights is that it's not a contract interpretation issue. It's a bargaining unit issue. That's why the NLRB has rejected arguments. What do you make of this language, though, in that case? It says the NLRB lacks jurisdiction to consider an ERISA claim. Enforcement claims by a fiduciary may be brought in federal court only. Enforcement claims by a fiduciary may be brought in federal court if they do not implicate representational issues like this case does. So I think you're right, Your Honor. The trustees are not allowed to go to the NLRB. That's correct. The union has to go to the NLRB. But wasn't there a question in that case whether there was a valid collective bargaining agreement? Well, I think in this case there's not a question whether there's a valid collective bargaining agreement. I think that's an important distinction that you'll see kind of ships passing in the night with this briefing. They're characterizing our arguments as challenging whether there's a valid collective bargaining agreement that exists and asserting contract formation defenses such as lack of majority status, fraud, typical contract. We're not asserting any of that. There is a valid contract here, and that contract is limited to Hutchinson only. What is there in the trust agreement that permits them to seek money for their services from a non-union employee? There's nothing, Your Honor. It's the exact opposite, and I think it's what makes this case unique, is the trust agreement specifically defines employees as those represented by the union. It specifically defines the contribution obligation in Section 4.1 of the trust as stemming solely from the collective bargaining agreement. So that issue has to be determined as to whether these people where this demand is being made are members of a union or subject to a collective bargaining agreement. Is that the idea? Right. The idea is that the employees at the standalone facility that is newly existent, there has to be a determination by the NLRB, and that can be because the employees go there and say we want to be represented by the union, or it can be because the union says there's such an interrelationship between these two facilities that the separate employees in Minnetonka don't have their own identity, functionally or otherwise, that they must be accreted into the unit with the Hutchinson employees. Five or ten years ago, it seems to me, we had a case here in Minnesota where something similar happened, and there was a geographical question about if it was within 15 miles or 20 miles or something like that. Here it's 50 miles, which is clearly, how does that bear, if at all, on this situation here? Is there a presumption that they're not members of the Hutchinson union if the new facility is 40 miles away? That's correct, Your Honor. There's a presumption under NLRB law that a single facility unit is appropriate. That presumption is rebuttable, and it's rebuttable with evidence regarding geographic distance, a very close distance. It's rebuttable with evidence of a close interrelationship of operations, transfer of bargaining unit employees back and forth, common supervision, common control. So in this particular case, to directly answer your question, the 50-mile separation between Hutchinson and Minnetonka would be a very damaging fact were the union to try to accrete Minnetonka employees into the unit, just as the complete lack of any interchange between them. They don't have the facts to go for accretion. That's why it didn't happen here. So it would be essentially a presumption against malgamating these two without something tangible, by way of agreement. Is that what you're saying? Yes, absolutely, there's a presumption. And again, it goes back to our argument about why this belongs at the NLRB. Those presumptions and those tests about newly established facilities, single versus multifacility units, they're all there to protect the Section 7 rights of a newly formed group of employees. And that's true even if a contract explicitly says, if you open a new facility, it's going to be covered by this contract. Still, the NLRB will say you have to have majority showing in order to have what's called an application of contract clause. That's what the Kroger, the after acquired stores clause. So is it legal to negotiate a contract that covers more than one facility? Absolutely it is. But there are Section 7 rights that even the NLRB says you have to show majority status. All it does is waive the employer's right to demand an election if you agree to a clause like that. I think it's notable here that there's no such clause. And Trustee Kern admitted for other contracts he negotiated in the industry, he negotiated very specific language in the recognition clause that said, this applies at this facility and any other facility you might open within the territorial jurisdiction of the union. That language isn't here. That's why it's very clear when you look at the contract, it was intended to apply to Hutchinson and Hutchinson only. No one's ever claimed otherwise. And if the claim now by the trustees is that you have one bargaining unit, they can't do that under ERISA. They are in that sense at the mercy of the union and the employer agreeing in the first instance. You hear a lot about third party beneficiary in their brief, but you can't have greater rights than the underlying parties do in the sense of what the contract's coverage is. So third party beneficiary doesn't come into play because there was never an agreement in the first instance to cover these employees over here who would suffer the most and who would be terminated under the contract. If you hold that contribution obligations apply, everything else applies. It's not a pick or choose what provisions of the contract apply. They either apply to Minnetonka or they do not. And if they apply, then GOBL has to fire each and every one of those employees because they're not members in good standing of the union. And the union never took that position. And the pension fund never took that position. I think that's very revealing. I think that goes to the issue of all the extrinsic evidence. There's no extrinsic evidence in support of the trustee's interpretation of the agreement. None. Zero. That's why there's nothing to try in this case. There is no he said, she said. Trustee Kern was told exactly what the status of that facility was. He never protested. He never sought clarification. The stewards who signed the contract were told at a meeting, this was open and notorious, we have another facility opening 50 miles away. It's not a secret. They never approached the company and said the agreement applies. You should be applying the wage rates. You should be applying health and welfare pension. None of that. They didn't say any of that. All of their cases rely on secret. They didn't try to organize the Minnetonka employees. They did not try to organize the Minnetonka employees either. So that's one of the channels. Accretion's another channel. There are many channels to get this contract to apply or to get those employees unionized. But ERISA is not an appropriate vehicle for doing so. If there's no further questions, I'll rest. Mr. Eiling, do you have some time? Your Honor, we're not here to seek firing any employee, nor are we here to enforce any obligation there is to make them union members. Our obligation is simply that we're trying to enforce is simply that to pay benefit contributions. I cite the court to Judge Beam's decision. We cite this in the brief in the Central States Independent Fruit Case 919F2nd 1343, analyzing 515 of ERISA and saying that this section creates a federal right of action independent of the contract on which the duty to contribute is based. There's an obligation to contribute benefits. We take that. We don't care about the other disputes in that agreement, or orally or otherwise, between the union and the employer. It's the obligation to contribute benefits independent from the contract on which the duty to contribute is based. And in that case, there was a dispute as to whether casual employees were covered or not, and the court said it is clear that this section creates a federal right of action independent of the contract on which the duty to contribute is based. We're focusing on the health benefits obligation, and the court is adopting and quoting from a D.C. Circuit case from 1989. The court goes on to state, if it means nothing else, Section 15 means that suit by a trustee cannot be thwarted by defenses not apparent from the face of the agreement. And this is being thwarted by defenses not apparent from the face of the agreement. The court did not... It's not a contract defense. I think counsel's right about that. The question is whether a valid contract provides the duty. Oh, there's all sorts of things in their brief about this is violation of Section 7 rights, and you can't just extend coverage and collective bargaining agreement to an after-acquired facility. There are Section 7 rights. There should be elections. Those are all labor relations issues outside the contract. The parties agreed to something quite broad. Whether or not that's going to cut the mustard with the NLRB, I think it would, but whether or not it'll cut the mustard with the NLRB doesn't matter. We're here to enforce a plain obligation to cover all employees of the employer. It's very simple. And the court, in independent fruit, did not adopt a primary jurisdiction argument. It simply said, hey, you've got very limited defenses here, and the trustees can enforce the plain meaning of the obligation to pay benefits. Thank you, Your Honor. Thank you. Thank you, counsel. Unusual case. Well argued. We'll take it under advisement.